**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. <u>12- 80218-CR-MARRA/MATTHEWMAN(s)(s)</u>

**UNITED STATES OF AMERICA**

**vs.**

**DYLAN HARRISON,**

      **Defendant.**

_____/

**PLEA AGREEMENT**

The United States Attorney's Office for the Southern District of Florida ("this Office") and Dylan Harrison (hereinafter referred to as the "defendant") enter into the following agreement:

1.  The defendant agrees to plead guilty to the information, which charges the defendant with  conspiracy  a) to manufacture and distribute a controlled substance analogue, in violation of Title 21, United States Code, Sections 813 and 841(a)(1); b) to knowingly conduct and attempt to conduct financial transactions  which involved the proceeds of specified unlawful activity, that is, violations of Title 21, United States Code, Section 841(a)(1), with the intent to promote the carrying on of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and   c)  to introduce and cause the introduction into interstate commerce of misbranded drugs, with the intent to defraud and mislead, in violation of Title 21, United States Code, Sections 331(a), 352(a) and 333(a)(2); all in violation of Title 18, United States Code, Section 371.

2.   The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter

"Sentencing Guidelines").  The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered.  The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines.  The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range.  Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

3.  The defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of up to 5 years, followed by a term of supervised release of up to 3 years.  In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000.

4.  The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $100  will be imposed on the defendant.  The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.  If a defendant is financially unable to pay the special

assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

5. This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

6. The United States agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will file a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. The United States, however, will not be required to make this motion and this recommendation- or any other recommendations set forth in this plea agreement- if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea

3

agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

7.     The United States and the defendant agree to jointly make the following recommendations under the United States Sentencing Guidelines to the Court:

(a)     That, pursuant to Section 2D1.1(c)(11), the equivalent quantity of controlled substance analogue exceeded 20 kilograms, for a base offense guideline level of 18;

(b)     That, pursuant to Section 2D1.1(b)(7), the defendants distributed a controlled substance through mass marketing, by means of interactive computer (2 level increase);

(c)     That, pursuant to Section 2D1.1(b)(12), the defendant maintained a premise for the manufacture of a controlled substance (2 level increase);

(d)     That pursuant to Section 3B1.1, the defendant was an organizer or leader of criminal activity involving less than five (culpable) persons (2 level increase);

(e)     That, with a three level decrease for acceptance of responsibility, the total offense level is 21.

8.     The defendant agrees that he shall cooperate fully with this Office by: (a) providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by this Office, whether in interviews, before a grand jury, or at any trial or other Court proceeding; (b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings, and at meetings, as may be required by this Office; and (c) if requested by this Office, working in an undercover role under the supervision of, and in

4

compliance with, law enforcement officers and agents.  In addition, the defendant agrees that he will not protect any person or entity through false information or omission, that he will not falsely implicate any person or entity, and that he that he will not commit any further crimes.

9.      This Office reserves the right to evaluate the nature and extent of the defendant's cooperation and to make that cooperation, or lack thereof, known to the Court at the time of sentencing.  If in the sole and unreviewable judgment of this Office the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the Court's downward departure from the advisory sentencing range calculated under the Sentencing Guidelines and/or any applicable minimum mandatory sentence, this Office may make a motion prior to sentencing pursuant to Section 5K1.1 of the Sentencing Guidelines and/or Title 18, United States Code, Section 3553(e), or subsequent to sentencing pursuant to Rule 35 of the Federal Rules of Criminal Procedure, informing the Court that the defendant has provided substantial assistance and recommending that the defendant's sentence be reduced.  The defendant understands and agrees, however, that nothing in this agreement requires this Office to file any such motions, and that this Office's assessment of the quality and significance of the defendant's cooperation shall be binding as it relates to the appropriateness of this Office's filing or non-filing of a motion to reduce sentence.

10.     The defendant understands and acknowledges that the Court is under no obligation to grant a motion for reduction of sentence filed by the government.  In addition, the defendant further understands and acknowledges that the Court is under no obligation of any type to reduce the defendant's sentence because of the defendant's cooperation.

11.  The defendant understands that if he intentionally provides false, misleading or incomplete information or testimony or otherwise fails or refuses to fully and truthfully

cooperate with the United States as set forth above, or violates any other provision of this plea agreement, the defendant's guilty plea will stand, but in all other respects this agreement shall be null and void, and the government's obligations under this plea agreement will terminate. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which this office has knowledge, including but not limited to perjury, obstruction of justice and any counts or offenses which were dismissed and/or not prosecuted as a result of this plea agreement. Any such prosecution may be premised upon any information provided by the defendant during the course of his cooperation and such information may be used against him.

12.     The defendant agrees to forfeit to the United States voluntarily and immediately all of his right, title and interest to any and all assets and their substitutes which are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 which are in the possession and control of the defendant or nominees including the following items:

a.   One parcel of land located at 602 N. Atlantic Drive, Lantana, Palm Beach County, Florida, 33462, including all buildings, improvements, fixtures, attachments, and easements found therein or thereon, and more particularly described as:

The North One-Half (N ½) of Lot 220, all of Lots 222 and 224 and the South Twelve and One-Half (S ½) Feet of Lot 226, Hupoluxo Island Add. No 2, according to the plat thereof, as recorded in Plat Book 15, Page 42, of the Public Records of Palm Beach County, Florida.

Tax Folio Number:40-43-44-34-10-000-2201

b.   The contents of Ameriprise Brokerage account number 0000 3616 6374 3 133 in the name of Dylan Jesse Harrison TOD (approximately $109,143.86).

c.   The contents of Ameriprise Strategic Portfolio Service Advantage account number 0000 1632 5206 7 133 in the name of Dylan Jesse Harrison TOD (approximately $109,812.04).

6

d.    The contents of PNC Bank account number 12 0873-3187 in the name of Elexa Klein as custodian for Stella Jane Harrison (approximately $100,000.68).

e.    The contents of PNC Bank account number 12 0873-3195 in the name of Elexa Klein as custodian for Eva Haze Harrison   (approximately $100,000.68).

f.    $110,750.00 in U.S. currency, CATs # 12-DEA-569475.

g.    $55,563.36 in U.S. currency, CATs # 12-DEA-569534.

h.    One (1) 2011 GMC Terrain SLT SUV, VIN 2CTFLWE52B6404294, CATs # 12-DEA-569703.

i.    One (1) Ulysse Nardin watch, CATs # 12-DEA-570382.

j.    Eight (8) Watches:   one men's Black Hublot Big Bang King, one men's black& stainless Jaquet Droz, one men's stainless IWC Schaffhausen Big Pilot, one men's titanium Luminor, one men's stainless Graham, one men's stainless steel Android Seagull Limited Edition, one men's tungsten Android, one men's black Android watch.   CATs # 12-DEA-570391.

13.    In addition to the above, the defendant further agrees to forfeit to the United States the following items which are being forfeited administratively by the Drug Enforcement Administration:

a.  $729,800.00 in U.S. currency, CATs # 12-DEA-569612.
b.  $6,100.00 in U.S. currency, CATs # 12-DEA-569635.
c.  A one hundred (100)   ounce bar of silver and a one (1) ounce bar of platinum, CATs # 12-DEA-570735.

14.    The defendant agrees that the above listed property is property constituting, or derived from proceeds traceable to the violations charged in Count 1 to which the defendant is pleading.   The defendant further agrees to turn over to the United States the contents of the bank accounts listed above at the time of the plea agreement.

7

15.    Defendant further agrees to fully cooperate and assist the Government in the forfeiture of the assets listed above, including the surrender of the above listed items, and to take whatever steps are necessary to pass clear title to the United States, including, but not limited to, the surrender of documents of title, execution of any documents necessary to transfer his interest in any of the above property to the United States, including any necessary corporate authorizations, obtaining executed consents to forfeiture from nominees, including Elexa Klein, or other documents as may be needed to fully accomplish the forfeiture and vest title in the United States. Upon execution of the consent to forfeiture by Elexa Klein and the stipulation and settlement by the defendant and Thomas Harrison, the United States will release the assets listed in those documents to be released.   Defendant further knowingly and voluntarily waives the following rights as to assets subject to forfeiture: (1) all constitutional, legal and equitable defenses to the forfeiture of the assets in any judicial or administrative proceeding; (2) any judicial or administrative notice of forfeiture and related deadlines; (3) any jeopardy defense or claim of double jeopardy, whether constitutional or statutory; (4) any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of these assets by the United States; and (5) any right to appeal any order of forfeiture entered by the Court pursuant to this plea agreement.   Defendant further understands that the forfeiture of these assets shall not be treated as satisfaction or offset against any fine, restitution, cost of imprisonment, or any other penalty this court may impose on the defendant.

16.    The defendant is aware that the sentence has not yet been determined by the Court. The  defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the

8

government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety.  The defendant understands and acknowledges,  as previously acknowledged in paragraph 2 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or  a  recommendation  made jointly by both the defendant and the government.

17 .   The defendant is aware that Title 18, United States Code, Section 3742 and Title 28, United States Code, Section 1291 afford the defendant the right to appeal the sentence imposed in this case.  Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Sections 3742 and 1291 to appeal any sentence imposed, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the advisory guideline range that the Court establishes at sentencing.  The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b) and Title 28, United States Code, Section 1291.  However, if the United States appeals the defendant's sentence pursuant to Sections 3742(b) and 1291, the defendant shall be released from the above waiver of appellate rights.  By signing this agreement, the defendant acknowledges that the defendant has discussed the appeal waiver set forth in this agreement with the defendant's attorney.  The defendant further agrees, together with the United States, to request that the Court enter a specific finding that the defendant's waiver of the defendant's right to appeal the sentence to be imposed in this case was knowing and voluntary.

18.    This is the entire agreement and understanding between this Office and the defendant.   There are no other agreements, promises, representations, or understandings.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: ___2/15/13___                 By: _____
                                    ROGER H. STEFIN
                                    ASSISTANT UNITED STATES ATTORNEY

Date: ___2/12/13___                 _____
                                    IAN GOLDSTEIN, ESQ.
                                    ATTORNEY FOR DEFENDANT

Date: ___2/15/13___                 _____
                                    NEIL SCHUSTER, ESQ.
                                    ATTORNEY FOR DEFENDANT

Date: ___2/12/13___                 _____
                                    DYLAN HARRISON
                                    DEFENDANT

10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-80218-CR-MARRA/MATTHEWMAN(s)(s)

UNITED STATES OF AMERICA   )
   )
v.   )
   )
   DYLAN HARRISON,   )
   )
   Defendant.   )
_____)

## FACTUAL PROFFER

The United States of America and DYLAN HARRISON (hereinafter the "defendant"), submit this factual proffer in support of the proposed plea agreement in this matter and stipulate that, if this case were to go to trial, the government would establish a prima facie case of guilt to the offense contained in the Second Superseding Information, based upon the following undisputed facts:

1.   The term "controlled substance analogue" means a substance: (1) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; and, (2) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or (3) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II. Title 21 United States Code 802(32)(A).

1

2.     Synthetic cannabinoids refers to chemical substances which mimic the physical and psychological effects of marijuana and are intended to be ingested in the human body, mainly through smoking.     Synthetic cannabinoid products are manufactured and packaged in clandestine labs throughout the United States and elsewhere and are frequently sold via the internet and through "legitimate" establishments, such as convenience stores, gas stations, smoke shops, head shops and other retail outlets.   The substances have been packaged and sold under various name brands.   The packaging often refers to the product as "incense" or "potpourri," and bears false labeling, stating that it is "not for human consumption."     In fact, as the manufacturers, distributors and end users of these products are well aware, the product has no purpose other than for human consumption.

3.     On or about March 1, 2011, a synthetic cannabinoid known as JWH-018   was placed on the temporarily banned listed by DEA as a Schedule I controlled substance. Therefore, any analogues of JWH-018 became illegal as well.

4.     In January 2012, agents from the West Palm Beach Resident Office of the DEA initiated an investigation into the activities of an individual (J.L.) who was believed to be a distributor of synthetic cannabinoids in South Florida.     As a result of the investigation, on March 30, 2012, agents executed a federal search warrant on a business belonging to J.L. and seized thousands of packages of synthetic cannabinoid products, among other things.   A large majority of the synthetic cannabinoid products seized from J.L.'s business was packaged and sold under the brand name "Mr. Nice Guy".

5.     J.L identified the defendant as one of the suppliers of the Mr. Nice Guy products. J.L. admitted that he had been purchasing synthetic cannabinoids from the defendant for approximately a year.     Under DEA supervision, J.L made a controlled purchase of additional

2

"Mr. Nice Guy" products.     The delivery of the products took place in a parking lot in Boca Raton, Florida, and was made by one of the employees of the defendant..   The amount of synthetic cannabinoid product delivered that afternoon was approximately 20 kilograms.

6.     Representative samples of the Mr. Nice Guy products seized from J.L.were submitted to a DEA lab for testing and tested positive for several chemical compositions, including 1-(5-Fluoropentyl)-3-(1-naphthoyl)indole, commonly known as AM-2201.   According to DEA chemists, AM-2201 has a similar chemical structures to that of JWH-018. Additionally, AM- 2201 has the same or similar physiological effect on the human body when ingested as that of JWH-018.     Therefore, AM-2201 meets the definition of a controlled substance analogue.

6.  The evidence would additionally show that the defendant was involved in manufacturing synthetic cannabinoid products under the  "Mr. Nice Guy" brand name subsequent to March 2011, when JWH-018 was listed as a Schedule I controlled substance, and that AM-2201 was one of the chemicals utilized by the defendant.    The defendant further operated under a number of company names, including Kratom Lab Inc, AGX Products, LLC, AXG Commercial Lending Group, LLC, and Florida Premier Distributors, LLC, among others, all located in Palm Beach County, Florida.   Witnesses would identify the defendant as one of the owners of Kratom Lab and a principal behind the other companies.   Employees of the defendant were aware that the product being manufactured was for human consumption, despite the labeling on the packaging which falsely stated otherwise.    Employees were also generally aware that the products, when ingested, had the same or similar physiological effect on the human body as other synthetic cannabinoids.   The product was advertised over the internet and sold both locally and to customers throughout the United States.

3

7.    The evidence would show that chemicals used by Kratom Lab to manufacture the Mr. Nice Guy products were being imported from China.   The evidence would also show that the "Mr. Nice Guy" product consists of marshmallow leaf, acetone, and the chemical analogue. According to witnesses, the marshmallow leaf would be placed into an industrial sized cement mixer, and would then be sprayed with the powder analogue that has been diluted in acetone. Due to the strong odor and toxic fumes from the acetone and the analogue, Kratom Labs' employees would wear protective gear during the mixing process.

8.    The marshmallow leaf or similar plant materials would be purchased from overseas, and paid for by wire transfer from bank accounts established by the defendant and Shealey.    On or about February 2, 2012, the defendant caused a wire transfer in the amount of $100,000 to be made from the bank account of Kratom Lab Inc at PNC Bank to Rosbio Bulgara LTD, at Unicredit Bank, Sofia, Bulgaria.    This was in payment for product used in the manufacturing process.

9.    On July 25, 2012, agents from DEA executed a search warrant at a warehouse located at 2350 N. Military Trail, West Palm Beach, Florida, which had been identified as the most recent location for Kratom Lab.    As a result of the search, agents seized various varieties of Mr. Nice Guy product.

10.    Packaging on the Mr. Nice Guy synthetic cannabinoid products falsely stated that the product was "incense" or "potpourri" and was "not for human consumption," when the defendant knew otherwise.

11.    The defendant acknowledges that he was involved in manufacturing more than 20 kilograms of synthetic cannabinoids containing AM-2201.

The foregoing occurred in the Southern District of Florida and elsewhere.

4

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: _____        By: _____
                               ROGER H. STEFIN
                               ASSISTANT UNITED STATES ATTORNEY

Date: 2/12/13                  _____
                               IAN GOLDSTEIN, ESQ.
                               ATTORNEY FOR DEFENDANT

Date: 2/15/13                  _____
                                  NEIL SCHUSTER, ESQ.
                               ATTORNEY FOR DEFENDANT

Date: 2/12/13                  _____
                               DYLAN HARRISON
                               DEFENDANT

5